FILED IN CHAMBERS
U.S.D.C. - Atlanta

JUN 2 3 2011

James N. Hatten, Clerk
By: *Am Cauui*
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

RAJASHAKHER P. REDDY

CRIMINAL CASE NO.

1:09-CR-483-ODE

ORDER

This criminal case is before the Court on Defendant Rajashakher P. Reddy's ("Defendant") objections [Doc. 102] to the Report and Recommendation ("R&R") issued by Magistrate Judge Alan J. Baverman [Doc. 91]. Magistrate Judge Baverman recommended that the government's Motion to Preclude Expert Testimony [Doc. 71] be granted. For the following reasons, the Court ADOPTS the R&R [Doc. 91], Defendant's objections to the R&R [Doc. 102] are OVERRULED, and the government's Motion to Preclude Expert Testimony [Doc. 71] is GRANTED.

I.    Background

In the R&R, Magistrate Judge Baverman included a detailed recitation of the facts [Doc. 91 at 8-16]. Because no party has objected to the accuracy or completeness of the facts set out in the R&R, the Court adopts Magistrate Judge Baverman's account of the facts for the purposes of this Order. The facts summarized below have been derived from the R&R. The procedural history included below is from the record.

A.    Factual Background

Defendant, a board-certified radiologist, owns and operates Reddy Solutions, Inc. ("RSI"), an Atlanta-based teleradiology

company that allows a patient, hospital, or other client to exchange information electronically with RSI so that a radiologist who is not on-site may review the film [Doc. 91 at 5]. Any hospital or other facility that performs an x-ray, MRI, CT scan or other test on-site may electronically transmit the films or images to RSI for a radiologist to review and send back a final report [Id.]. RSI does not bill Medicare and private insurers for the services, but instead RSI's clients such as hospitals and other medical facilities bill the insurers directly; RSI's clients then pay RSI a flat monthly fee, a fee per individual read, or a combination of both [Id. at 6]. Defendant operated RSI and served as a radiologist for RSI, submitting signed reports to client hospitals and other providers [Id. at 5-6].

RSI also employs radiological technicians, who are not physicians, who perform preliminary reviews of films and create draft radiology reports; the radiological technicians are not allowed to give diagnoses [Id. at 6]. When a radiological technician creates a draft radiology report, a physician must subsequently perform an independent review of the films and data before accepting the findings and diagnoses in the draft report and signing the report [Id.].

The second superseding indictment alleges that Defendant fraudulently signed and submitted radiology reports for "tens of thousands" of patients to hospitals and other RSI clients where neither he nor any other physician had reviewed and analyzed the film [Id. at 7]. The indictment alleges that radiological technicians reviewed the films and prepared draft reports and then the Defendant signed and submitted the reports under his name

without reviewing the films [Id.].  The indictment alleges that Defendant devised a scheme to defraud "by claiming to have performed health care services that he did not in fact perform" [Id. at 5].

B.    Procedural History

On November 3, 2009 a federal grand jury sitting in the Northern District of Georgia charged defendant with a 28 count indictment: sixteen counts (Counts 1 through 16) of wire fraud, in violation of 18 U.S.C. § 1343; seven counts (Counts 17 through 23) of mail fraud, in violation of 18 U.S.C. § 1341; four counts (Counts 24 through 27) of health care fraud, in violation of 18 U.S.C. § 1347; and one count (Count 28) of falsification of records in a federal investigation, in violation of 18 U.S.C. § 1519 [Doc. 1].  The first indictment was superseded on December 2, 2009 [Doc. 23], which was again superseded on July 13, 2010 [Doc. 67].  The second superseding indictment charged defendant with 37 counts: wire fraud, in violation of 18 U.S.C. § 1341 (Counts 1 through 25); mail fraud, in violation of 18 U.S.C. § 1341 (Counts 26 through 32); health care fraud, in violation of 18 U.S.C. § 1347 (Counts 33 through 36); and falsification of records in a federal investigation, in violation of 18 U.S.C. § 1519 [Id.].  The indictment relates to a time period between May 2007 and January 2008 [Id.].  Defendant entered a plea of not guilty to all 37 counts before Magistrate Judge Gerrilyn G. Brill on July 28, 2010 [Doc. 72].

The R&R states that on June 25, 2010 Defendant informed the government that he planned to call Dr. Benjamin Sacks as an expert witness [Doc. 91 at 4].  On July 27, 2010 the government moved to

preclude this expert testimony or, in the alternative, to have a hearing on the basis for the expert opinion [Doc. 71]; Defendant responded in opposition [Doc. 79] and the government replied [Doc. 80].   Magistrate Judge Baverman held an evidentiary hearing concerning the government's Motion to Preclude Expert Testimony on September 23, 2010 [Doc. 81].   The government filed a post-hearing brief with regard to the government's Motion to Preclude Expert Testimony on November 1, 2010 [Doc. 83]; Defendant responded to the government's brief on December 6, 2010 [Doc. 87] and the government replied on January 6, 2011 [Doc. 89].

Magistrate Judge Baverman entered the R&R, recommending that the government's Motion to Preclude Expert Testimony be granted, on February 24, 2011 [Doc. 91].   Pursuant to 28 U.S.C. § 636(b)(1), the parties were granted fourteen (14) days from the entry date of the R&R to file any written objections to the R&R [Id.].   Defendant sought and received an extension of time to file objections to Magistrate Judge Baverman's R&R until March 31, 2011 [Docs. 98 and 99]; Defendant filed the instant objections on March 31, 2011 [Doc. 102].

C.    Facts Shown at the September 23, 2010 Evidentiary Hearing

Doctor Manju Morrissey is a board certified physician in internal medicine [Doc. 91 at 8].   She earned her medical degree at Louisiana State University ("LSU"), completed her fourth year rotation at Harvard University, completed her residency in internal medicine at LSU, and obtained her master's degree in public health from Harvard University [Id.].   Dr. Morrissey practiced medicine from 1995-2001, after which she earned her

master's degree and was subsequently employed by a pharmaceutical company from 2002-2007 and a medical device company from 2007-2008 [Id. at 8-9].   Dr. Morrissey then moved to RSI to work as its chief administrative officer [Id. at 9].   Dr. Morrissey studied statistics for nine months at Harvard and had exposure to statistics through her various jobs, but did not obtain a degree or professional certification in statistics [Id.].

When Dr. Morrissey arrived at RSI, she was asked to create and implement a peer review to examine Defendant's radiology reports completed between April or May of 2007 and March 2008 [Id.].   To obtain a statistically valid sample for the peer review, Dr. Morrissey used the RAT-STATS computer program, which was recommended by the Office of Inspector General at the Department of Health and Human Services [Id. at 10].   To determine the appropriate sample size for the peer review, Dr. Morrissey assigned 90% for the confidence level, 10% for precision, 91,000 for the universe size, and 50% for the rate of occurrence.   The RAT-STATS program determined that an appropriate sample size for the peer review of Defendant's radiology reports was 287 exams [Id. at 11-12].

Dr. Morrissey consulted with RSI's IT manager, Dan Rabideau, to generate the sample [Id. at 13].   Dr. Morrissey gave Mr. Rabideau the 91,000 files and instructed Mr. Rabideau that the cases needed to be "extracted at a random basis" and the random generation of images "was the most critical point" of the peer review [Id.].   Mr. Rabideau created month-by-month spreadsheets for the cases and provided the monthly spreadsheets as a means to

randomly select the sample images [Id.]. Mr. Rabideau suggested
that the peer reviewer "just pick one month and move." [Id.].

Dr. Morrissey hired Dr. Benjamin Sacks to perform the peer
review at the RSI offices [Id. at 12]. Dr. Sacks was paid $1,800
per day for the week-long period it took him to complete the peer
review [Id.]. Dr. Sacks graduated from Cornell University with a
B.A. in biology, obtained his medical degree from UCLA, had a
four-year residency in diagnostic radiology at Emory University,
and then became a certified radiologist in June 2008 [Id. at 13-
14]. Dr. Sacks never personally performed peer reviews, but in
his training he was taught to use and often observed the RADPEER
peer review process, a process instituted by the American College
of Radiology, as their model for peer review [Id. at 14].

Dr. Sacks performed a RADPEER peer review for RSI in
September 2008, using a four point scoring system to grade the
prior studies (1 indicates the reviewing radiologist concurs with
the report, 2 indicates a minor discrepancy, 3 indicates a more
obvious error, and 4 indicates a "gross miss") [Id. at 14-15].
Dr. Sacks was not involved in the process to determine the number
of samples to analyze [Id. at 15]. He was however tasked with the
job of selecting images from spreadsheets generated by the IT
department [Id.]. In using his discretion, Dr. Sacks chose which
images to review based on his "gut feeling" [Id.]. Dr. Sacks
reviewed 1,060 images that were initially analyzed by RSI between
October 2007 and March 2008 [Id.]. While the entire sample size
provided from IT was from March 2007 to March 2008, Dr. Sacks did
not review any images from the sample from March 2007-September
2007.

The Defendant now seeks to introduce expert testimony from Dr. Sacks at trial about the RADPEER review he completed for RSI in September 2008 [Id. at 4]. Defendant seeks to introduce Dr. Sacks' testimony as evidence that Defendant reviewed the images and reports before signing them [Id. at 38]. At the evidentiary hearing held before Magistrate Judge Baverman, Defendant represented that Dr. Sacks would testify that after completing the RADPEER review of the reports signed by the Defendant, Dr. Sacks found that there were no errors in the reports [Id. at 4]. Defendant's theory is that if Dr. Sacks could show that the reports he reviewed were accurate, the accuracy of the reports would serve as evidence that the Defendant reviewed the images and reports before signing them [Id. at 39].

The government objects to this testimony, arguing that the testimony should be excluded under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

   D.   Magistrate Judge Baverman's Report and Recommendation

Magistrate Judge Baverman recommended that the government's Motion to Preclude Expert Testimony be granted for several reasons. First, Magistrate Judge Baverman determined that the Motion to Preclude Expert Testimony should be granted because Dr. Morrissey and Dr. Sacks were not qualified for the tasks they were directed to complete. Magistrate Judge Baverman stated that Dr. Morrissey was not qualified in the area of designing and implementing a sampling methodology and Dr. Sacks was not qualified to testify as to the statistical validity of the peer review because he was not qualified as an expert in statistics and he was not qualified to randomly select the images. The

7

government conceded that Dr. Sacks was qualified to review the images from the sample using the RADPEER procedure; however Dr. Sacks lacked the proper qualification to ascertain that his selection of the images to review was statistically random.

Next Magistrate Judge Baverman concluded that the Motion to Preclude Expert Testimony should be granted because the methodology employed in generating the sample was not reliable. First Magistrate Judge Baverman noted that Dr. Morrissey's and Dr. Sacks' qualifications were minimal because Dr. Morrissey had no experience in designing a statistically valid peer review procedure and Dr. Sacks had no statistical knowledge to randomly select images to review. Second, Magistrate Judge Baverman indicated that the sample was not created from a random sampling that ensured every one of the 91,000 images had an equal chance of being selected; instead Dr. Sacks selected images from spread sheets that were divided by months and relied on his belief that he should select samples from each type of image. Additionally Dr. Sacks only selected images from spreadsheets of images that were initially analyzed by RSI between October 2007 and March 2008 and not images from the entire universe of 91,000 images (which also included images that were initially analyzed by RSI between March 2007 and September 2007). Third, Magistrate Judge Baverman concluded that the methodology cannot be tested because Dr. Sacks relied on his "gut feeling" in selecting the sample of images to review, and "gut feelings" cannot be tested. Fourth, Magistrate Judge Baverman stated that there is no evidence to show that the methods employed (RAT-STATS and RADPEER) are those generally used for medical peer reviews.

Finally, Magistrate Judge Baverman recommended that the Motion to Preclude Expert Testimony be granted because Dr. Sacks' peer review testimony is not relevant to the facts in this case. Magistrate Judge Baverman noted that the indictment relates to a period between May 2007 and January 2008 and 69% of the images evaluated by Dr. Sacks were from February and March 2008, a period outside the indictment period.

II. Discussion

Pursuant to 28 U.S.C. § 636(b)(1), the Court must conduct a de novo review of those portions of the R&R to which Defendant has timely and specifically objected. The Court may accept, reject, or modify, in whole or in part, the findings and recommendations made by the magistrate judge. 28 U.S.C. § 636(b)(1); United States v. Raddatz, 447 U.S. 667, 673-74 (1980). The portions of the R&R to which Defendant offers no specific objection will be assessed for clear error only. See Tauber v. Barnhart, 438 F. Supp. 2d 1366, 1373 (N.D. Ga. 2006)(Story, J.)("[I]ssues upon which no specific objections are raised do not so require de novo review; the district court may therefore 'accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge[,]' applying a clearly erroneous standard.") (quoting 28 U.S.C. § 636(b)(1)).

Defendant raises four specific objections to the R&R: 1) Magistrate Judge Baverman failed to address crucial legal principles that apply to the admissibility of expert testimony; 2) Magistrate Judge Baverman erred in concluding that both Dr. Morrissey and Dr. Sacks do not qualify as experts; 3) Magistrate Judge Baverman incorrectly determined that the methodologies used

by Dr. Morrissey and Dr. Sacks were not "reliable"; and 4) Magistrate Judge Baverman erred in concluding that the testimony about the peer review is not relevant.

A.   Legal Principles that Apply to the Admissibility of Expert Testimony

Defendant argues that Magistrate Judge Baverman ignored legal principles that he should have considered when recommending whether the government's Motion to Preclude Expert Testimony should be granted or denied.  Specifically, the Defendant claims Magistrate Judge Baverman did not consider that: (1) "rejection of expert testimony is the exception rather than the rule" (Defendant cites to the advisory committee notes for the 2000 amendments to Federal Rule of Evidence 702); that (2) "courts should interpret the qualification requirement 'liberally' and not insist on a certain kind of degree or background" (Defendant cites to five different cases from the United States Court of Appeals for the Third Circuit); and that (3) "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence" (Defendant cites to Allison v. McGhan Medical Corp., 184 F.3d 1300, 1311 (11th Cir. 1999)).

As to the first legal principle, Magistrate Judge Baverman did recognize that rejection of expert testimony is the exception rather than the rule; Magistrate Judge Baverman stated in his R&R that the inquiry into whether a witness qualifies as an expert is "a relatively low threshold." [Doc. 91 at 19].  Magistrate Judge Baverman went on to conclude that the expert testimony at issue did not meet the "low threshold" and therefore was an "exception" to the admissibility rule, but he did consider the legal principle

10

in his analysis.  Thus, Magistrate Judge Baverman addressed this legal principle in the R&R.

As to the second legal principle, it was within Magistrate Judge Baverman's discretion to disregard non-binding authority from the Third Circuit.  Thus, this objection fails.

As to the third legal principle, Defendant's argument is misguided.  The case law to which Defendant refers states specifically that the district court's "gatekeeper role . . . is not intended to supplant the adversary system or the role of the jury" for "shaky but admissible evidence."  Allison, 184 F.3d at 1311 (internal quotation marks and citation omitted).  Here, as discussed below, the evidence is not admissible.  The judge's role "is to keep unreliable and irrelevant information from the jury."  Id. at 1311-12.  Magistrate Judge Baverman's recommendation is in line with this role; it keeps unreliable, irrelevant, inadmissible evidence from the jury.

B.   Dr. Morrissey's and Dr. Sacks' Qualifications as Experts, Reliability of the Methodologies, and Relevancy of the Peer Review Testimony

In Defendant's remaining objections, Defendant essentially objects to the entirety of Magistrate Judge Baverman's Daubert analysis, arguing that Dr. Morrissey and Dr. Sacks are qualified as experts, that the methodologies used were reliable, and that the expert testimony is relevant to the facts in this case.  Thus, the court will review the entire Daubert analysis de novo.

Federal Rule of Evidence 702 provides:

If scientific, technical, or other specialized knowledge
will assist the trier of fact to understand the evidence
or to determine a fact in issue, a witness qualified as
an expert by knowledge, skill, experience, training, or
education, may testify thereto in the form of an opinion

11

or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.   In <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, the Supreme Court of the United States clarified that expert testimony is admissible under Rule 702 if:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

<u>City of Tuscaloosa v. Harcros Chems., Inc.</u>, 158 F.3d 548, 562-63 (11th Cir. 1998)(citing <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 589 (1993) (footnote omitted)).   Thus, all three elements must be satisfied for expert testimony to be admissible. As the proponent of the expert testimony, the Defendant bears the burden of proof by a preponderance of the evidence to establish all three prongs of the <u>Daubert</u> analysis.   <u>McCorvey v. Baxter Healthcare Corp.</u>, 298 F.3d 1253, 1256 (11th Cir. 2002)(internal quotation marks and citation omitted).

> 1. <u>Whether Dr. Morrissey and Dr. Sacks Qualify as Experts</u>

The United States Court of Appeals for the Eleventh Circuit has recognized that statistics and sampling are scientific fields that are the proper subject of expert testimony.   <u>Johnson v. DeSoto Cty. Bd. of Comm'rs</u>, 204 F.3d 1335, 1342 (11th Cir. 2000). However, such experts must have considerable experience in the analysis of statistical evidence.   <u>City of Tuscaloosa v. Harcros Chems., Inc.</u>, 158 F.3d 548, 564 n.20 (11th Cir. 1998).   Under Rule

12

702, a witness may be qualified as an expert by "knowledge, skill, experience, training, or education." FED. R. EVID. 702. The Court will look to the qualifications of both Dr. Morrissey and Dr. Sacks, as Dr. Morrissey developed the sample which Dr. Sacks then reviewed to inform his expert testimony.

As the person who developed the statistical strategy to collect the sample for Dr. Sacks to review, Dr. Morrissey must qualify as an expert in statistics. While Dr. Morrissey has some knowledge of statistics (she studied statistics for nine months at Harvard and had exposure to statistics through her various jobs), Dr. Morrissey does not have a degree or professional certification in statistics. Thus Dr. Morrissey's educational background does not suggest that she is an expert qualified to employ statistical techniques to develop the peer review procedure she developed here. Dr. Morrissey's experience and training centers around the practice of medicine. She is a board certified physician in internal medicine and has obtained a master's degree in public health from Harvard University. Dr. Morrissey practiced medicine from 1995-2001 and was subsequently employed by a pharmaceutical company and a medical device company, where she often worked with statisticians as a peer reviewer, but was never involved in the development of the statistical samples selected for peer review. Her general education and exposure to the field of developing statistically sound peer review samples is inadequate to qualify her as an expert. Further, she has never worked with the RAT-STATS program she utilized in developing the peer review here, nor did she seek guidance in using the RAT-STATS program to ensure

that the peer review sample was statistically sound.  Thus, Dr. Morrissey does not qualify as an expert.

As to Dr. Sacks' expertise, while Dr. Sacks is certainly qualified as an exert to review the images, Dr. Sacks is not qualified to testify that the group of images he selected to review were statistically accurate as a random selection of images.  Dr. Sacks was tasked with randomly selecting which images to review from a group of spreadsheets produced by the IT department at RSI.  Dr. Sacks has no background in statistics, yet he was responsible for deciding which images to review.  As he testified at the evidentiary hearing, Dr. Sacks chose which images to review based on his "gut feeling."  He also only selected images that were in the spreadsheets from October 2007 through March 2008, although the entire sample size was from March 2007 to March 2008.  Thus, not only does Dr. Sacks lack the qualifications to testify that the sample he selected was statistically random, it is factually impossible for him to make that determination because he excluded a portion of the entire sample in making his selections.  Dr. Sacks cannot qualify as an expert to testify about the sample selected for the peer review.

The Defendant has failed to satisfy his burden by a preponderance of the evidence that Dr. Morrissey and Dr. Sacks are experts, as required by the first prong of the <u>Daubert</u> analysis. Thus, the government's Motion to Preclude Expert Testimony should be granted because the Defendant has failed to show that Dr. Morrissey and Dr. Sacks qualify as experts.

Magistrate Judge Baverman correctly concluded that Dr. Morrissey and Dr. Sacks do not qualify as experts and Defendant's second objection to the R&R thus fails.

 2. Whether the Methodologies used by Dr. Sacks are Reliable

Because the Court found that Dr. Morrissey and Dr. Sacks are not experts, the Court need not reach a conclusion as to the second Daubert prong, reliability of the methodologies. However, in an abundance of caution, the Court will review de novo the reliability of the methodologies used by Dr. Sacks in his peer review.

As Dr. Morrissey testified during the evidentiary hearing held by Magistrate Judge Baverman, the most critical aspect of the peer review conducted by Dr. Sacks was that the images reviewed be selected in a random manner, so that every one of the reports in the entire universe of the Defendant's reports had an equal chance of being selected for review by Dr. Sacks. However, as Dr. Sacks testified, his selection of images and reports to review was not entirely random.

Dr. Sacks had no statistical knowledge or background to utilize in his selection of images. Instead, he used his "gut feeling" and chose reports so that he could review an assortment of images such as x-rays, MRIs and CT scans. Thus, each image and its corresponding report did not have an equal chance of selection because Dr. Sacks gave preferential treatment to certain images to ascertain he had a variety. Additionally, Dr. Sacks only selected images from the generated spreadsheets for the months of October 2007 through March 2008. The entire universe of the Defendant's

reports to select from, however, was generated from May of 2007 through March of 2008.  Thus, because Dr. Sacks did not even look at or consider selecting images from the spreadsheets for May, June, July, August, and September 2007, those images certainly did not have an equal chance of being selected for the sample; instead there was no chance they would be selected.  Because Dr. Sacks' selection of the images and reports to review was not statistically random as required by the RAT-STATS program, the methodology Dr. Sacks used for the peer review which informed his testimony is not reliable.

The methodologies by which Dr. Sacks reached his conclusions are not sufficiently reliable; the Defendant has failed to satisfy his burden by a preponderance of the evidence that Dr. Sacks' testimony would satisfy the second prong of the Daubert analysis. Thus, even if Dr. Morrissey and Dr. Sacks were qualified as experts to testify, the government's Motion to Preclude Expert Testimony should be granted because the Defendant has failed to show that the methodologies used for the peer review were reliable.

Magistrate Judge Baverman correctly determined that the methodologies used were not reliable and Defendant's third objection to the R&R thus fails.

> 3.  Whether Dr. Sacks' Testimony would Assist the Trier of Fact to Understand the Evidence or Determine a Fact in Issue

Because the Court found that Dr. Morrissey and Dr. Sacks do not qualify as experts and the methodologies used were not reliable, the Court need not reach a conclusion as to the third Daubert prong, relevancy.  However, in an abundance of caution,

16

the Court will review <u>de novo</u> whether Dr. Sacks' testimony about the peer review would assist the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

"Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." <u>Daubert</u>, 509 U.S. at 591 (internal quotation marks and citations omitted). Additionally, the testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." <u>Id.</u>   Here, Dr. Sacks completed a peer review of a sample of images RSI reviewed between October 2007 and March 2008, 69% of which were from February and March 2008. The indictment in this case alleges 37 different counts that took place during the time period of May 2007 through January 2008. Thus, 69% of the images Dr. Sacks reviewed in his peer review were outside the time period identified in the indictment. Additionally, Dr. Sacks did not review any of the images the Defendant alleges to have properly reviewed and interpreted between May 2007 and September 2007. Because the majority of Dr. Sacks' testimony would relate to facts that occurred outside the time specified in the indictment and because Dr. Sacks' testimony would not include facts about a portion of the time period specified in the indictment, the overwhelming majority of Dr. Sacks' testimony would not relate to any issue in the case and thus is not relevant.

Dr. Sacks' testimony about the peer review would not assist the trier of fact to understand the evidence or to determine a fact in issue; the Defendant has failed to satisfy his burden by

a preponderance of the evidence that Dr. Sacks' testimony would satisfy the third prong of the <u>Daubert</u> analysis.  Thus, even if Dr. Morrissey and Dr. Sacks were qualified as experts to testify and even if the methodologies by which Dr. Sacks reached his conclusions were sufficiently reliable, the government's Motion to Preclude Expert Testimony should be granted because the Defendant has failed to show that Dr. Sacks' testimony is relevant to the facts at issue.

Magistrate Judge Baverman correctly concluded that the expert testimony is not relevant to the facts of this case and Defendant's fourth objection to the R&R thus fails.

III. <u>Conclusion</u>

The Court has carefully reviewed the R&R and Defendant's objections thereto.  After a <u>de novo</u> review of the portions of the R&R to which Defendant specifically objected and a review for clear error of the portions to which Defendant offered no specific objections, and for the foregoing reasons, Defendant's objections to the R&R [Doc. 102] are OVERRULED, the R&R [Doc. 91] is ADOPTED IN ITS ENTIRETY, and the government's Motion to Preclude Expert Testimony [Doc. 71] is GRANTED.


SO ORDERED this __23__ day of June, 2011.


ORINDA D. EVANS
UNITED STATES DISTRICT JUDGE